**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| PEDRO J. NIEVES, Individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | Civil Action No. |
| AMERICAN INTERNATIONAL GROUP INC., AIG COMPENSATION COMMITTEE AMERICAN GENERAL CORPORATION ADMINISTRATIVE BOARD, AMERICAN GENERAL CORPORATION PERSONNEL POLICY COMMITTEE, AIG RETIREMENT BOARD, MAURICE R. GREENBERG, RICHARD A. GROSIAK, ALEX I. FREUDMANN, DONALD  KARAK, HOWARD I SMITH, MARTIN J. SULLIVAN, EDMUND S.W. TSE, MARSHALL A. COHEN, FRANK J. HOENEMEYER, RICHARD C. HOLBROOK, BARBER B. CORABLE, JR.ELLEN V. FUTTER, JOHN A. AMATO ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

_____

**CLASS ACTION COMPLAINT FOR PLAN-WIDE RELIEF FOR VIOLATIONS**
**OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiff Pedro J. Nieves, a participant in the American International Group, Inc. Incentive Savings Plan (the "Plan"),[1] on behalf of himself and a class of all others similarly situated, alleges as follows:

## INTRODUCTION

1.     This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Defendants, fiduciaries of the Plan and the AGC's General Agent's and Managers' Thrift Plan ("AGC Plan") (collectively, the "Plans").

2.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals.  An employee participating in a 401(k) plan may have the option of purchasing the common stock of his employer, often the sponsor of the plan, for part of his retirement investment portfolio.  Common stock of American International Group, Inc. ("AIG" or the "Company") is one of the investment alternatives and/or vehicles of the Plans.

3.     Plaintiff was employed with AIG during the Class Period (defined below) and is still a current participant in the Plan.  Plaintiff's retirement investment portfolio includes AIG stock.

4.     Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to the other participants and beneficiaries of the Plans in violation of ERISA, particularly with regard to the Plans' holdings of AIG stock.

5.     Defendants offered Company stock as an investment alternative/investment vehicle for the Plans during the Class Period despite their knowledge, actual or constructive, that

---

[1] Plaintiff also brings this action on behalf of the following plans and their participants and beneficiaries: (1) the **American General Employees' Thrift and Incentive Plan**, (2) the **HSB 401(k) Plan**, (3) the **AIG SunAmerica 401(k) Plan**, (4) the **American International Group, Inc. Life Insurance Companies Incentive & Compensation Plan** (5) the **SunAmerica Profit Sharing and Retirement Plan**, (6) the **AIG 401(k) Plan**, (7) **AGC 401(k) Plan**, (8) the **Commoloco Thrift Plan**, and (9) their respective predecessor and/or successor plans.

such investments were imprudent due to the Company's accounting machinations and wide-spread corporate malfeasance.

6.     Indeed, the corporate malfeasance and accounting improprieties described herein have led to investigations by the Securities & Exchange Commission ("SEC"), Department of Justice, New York attorney general's office and New York State Insurance Department.  Further, New York Attorney General Elliot Spitzer has stated publicly that criminal charges against AIG employees are possible and that the focus of his probe was on Defendant Greenberg's actions.

7.     Because of the foregoing business improprieties and accounting machinations and their concomitant, invariable effect on the Company's stock price, throughout the Class Period, Defendants knew or should have known that AIG stock was an imprudent investment alternative for the Plans, either for individual or Company matching contributions.

8.     Despite this knowledge, Defendants failed to protect the Plans from unavoidable losses in value to their significant investment in AIG stock once these malfeasances came to light.  Indeed, the share price of AIG stock has dropped significantly as these illicit practices have been revealed, causing serious damage to the Plans' assets, and concomitantly to the retirement savings of the Plans' participants and beneficiaries.

9.     Defendants are liable under ERISA to restore losses sustained by the Plans as a result of their breaches of their fiduciary obligations.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. §1132(e)(2), because the Plans were administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

## THE PLANS

### AIG Incentive Savings Plan

12.     The Plan is an "employee pension benefit plan" as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A).

13.     The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a Plaintiff nor a Defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.  Stated differently, in this action, Plaintiff seeks relief on a "plan wide" basis.

14.     According to the Notes to Financial Statements to Form 5500 filed with the Department of Labor ("DOL") and the Internal Revenue Service ("IRS") for the years ending December 31, 2002 and 2001 (the "2002 Form 5500"), all salaried employees of AIG and its participating subsidiaries and affiliates who are age 18 or over and regularly employed in the United States are eligible to join the Plan on January 1 or July 1 following their date of hire.

15.     Employees may contribute between 1% and 25% of their annual compensation to the Plan, subject to government limits.   Highly compensated employees are limited to contributing 7% of their compensation to the Plan.

16.     The Company matches up to 6% of the employee's contributions to the Plan, based on years of service.  For example, in the case of participants with less than five years of service, the Company matches one-third of the first 6% of an employee's contributions.

However, the Company matches 100% of employee contributions from employees with ten or more years of service, up to the aforementioned maximum match amount of 6%.

17.      After five years of service, employees are immediately vested in the Company's matching contributions and earnings.  Matching contributions for employees with less than five years of service vest on December 31 of the year in which contributions were made.  Any employee who terminates service with the Company prior to the end of the year forfeits any Company matching contribution made for that year.

18.      The Plan offers twenty-six investment options, including the AIG Stock Fund, a non-diversified fund that invests solely in AIG common stock.  The Plan's 2002 Form 5500 states that only employer contributions may be invested in this fund.

19.      Vanguard Fiduciary Trust Company ("Vanguard") is the Trustee of the Plan.

**AGC's General Agent's and Managers' Thrift Plan**

20.      The American General Agents' and Managers' Thrift Plan ("AGC Plan") is, according the Company's Form 11-K AGC Plan annual report filed with the SEC for the fiscal year ended December 31, 2003 ("2003 AGC Form 11-K"), a defined contribution plan.  The AGC Plan is sponsored by American General Corp. ("American General" or "AGC"), a wholly owned subsidiary of AIG, and is available to agents and managers ("sales employees") of American General Life and Accident Insurance Company ("American General" or "AGC").

21.      Employees are eligible to participate in the AGC Plan after thirty days of employment.  Participants in the AGC Plan are permitted to contribute up to 3% of their base pay to the AGC Plan on a pretax basis ("basic contribution").  After reaching this 3% ceiling, Participants are then able to contribute an additional 1% to 50% of their base pay to the AGC Plan, up to the maximum contribution amount permitted by the IRS.

22.     AGC matches one-third of a participant's basic contribution.  Prior to January 1, 2002, all AGC matching contributions were made in AIG common stock.

23.     According to the 2003 11-K, effective January 1, 2002, all AGC matching contributions funded after December 31, 2001 were invested according to the participant's investment elections.  In addition, participants were allowed to reallocate at any time all AGC contributions made prior to December 31, 2001, into any of the investments offered under the AGC Plan.

24.     Participants are immediately vested in their contributions.  After three years of service, Participants are vested in AGC's matching contributions.[2]

25.     According to the 2003 AGC Form 11-K, the AGC Plan offers 15 different options to AGC Plan participants, including the AIG Stock Fund, for investment of their retirement savings.

26.     On January 1, 2003, Vanguard replaced AMVESCAP as Trustee for the AGC Plan.

1.     **PARTIES**

**Plaintiff**

27.     Plaintiff Pedro J. Nieves ("Plaintiff") worked for AIG, is a participant in the AIG Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and continues to hold AIG shares in his retirement investment portfolio.

**Defendants**

**American International Group, Inc.**

28.     Defendant AIG is a Delaware Corporation that maintains its principal place of

---

[2]  Prior to January 1, 2002, it took an AGC Plan participant five years to become vested in AGC's matching contribution.

business within this judicial district at 70 Pine Street, New York, New York 10270.  It describes itself at the world's leading international insurance and financial services organization with worldwide operations, and as the largest underwriter of commercial and industrial insurance in the United States.  According to the Plan's 2002 Form 5500, the Company has the ability to discontinue the Company's matching contributions (made with AIG stock) to the Plan "at any time."  Consequently, Defendant AIG is a fiduciary of the Plan as it exercises discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

29.     Upon information and belief, AIG is also the Plan's Sponsor.  AIG at all times acted through its Board of Directors, as well as officers and employees including its Chief Executive Officer ("CEO"), and members of any AIG oversight and/or Plan administrative committees appointed by the Company to perform Plan-related fiduciary functions in the course and scope of their employment.

30.     AIG had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their Plan-related activities.  Through its Board of Directors or otherwise, AIG had the authority and discretion to hire and terminate said officers and employees.  In addition, upon information and belief, the Board of Directors also had the authority and discretion to appoint, monitor, and remove individual directors, officers and employees from their individual fiduciary roles with respect to the Plan.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to Plan participants and their beneficiaries.  Accordingly, the actions of the Board of Directors, the Plan's administrative and/or investment committees and/or any

other employee fiduciaries are imputed to AIG under the doctrine of *respondeat superior*, and AIG is liable for these actions.

31.     Further, as a wholly owned subsidiary of AIG, the actions of AGC's officers, directors, employees and AGC itself are imputed to AIG under the doctrine of *respondeat superior*, and AIG is liable for these actions as well.

**American General**

32.     As previously stated, Defendant AGC is a wholly owned subsidiary of AIG. According to the 2003 AGC Plan Form 11-K, AGC has the ability to discontinue its matching contributions to the Plan "at any time."  Consequently, Defendant AGC is a fiduciary of the AGC Plan in that it exercises discretionary authority with respect to management and administration of the AGC Plan and/or authority over the management and disposition of the AGC Plan's assets.

33.     AGC is the AGC Plan's Sponsor.  Further, AGC at all times acted through its officers and employees, including members of any AGC oversight and/or AGC Plan administrative committees appointed by AGC to perform AGC Plan-related fiduciary functions in the course and scope of their employment.

34.     Upon information and belief, AGC had, at all applicable times, effective control over the activities of its directors, officers and employees, including over their AGC Plan-related activities.  Through these individuals, AGC had the authority and discretion to hire and terminate said officers and employees.  By failing to properly discharge their fiduciary duties under ERISA, the director, officer and employee fiduciaries breached duties they owed to AGC Plan participants and their beneficiaries.  Accordingly, the actions of these individuals are imputed to AGC under the doctrine of *respondeat superior*, and AGC is liable for these actions.

**Director Defendants**

35.     The Board of Directors at large was responsible for appointing members of the Compensation Committee.  Consequently, the Board of Directors and its members were fiduciaries of the Plan in that they exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

36.     Defendant Maurice R. "Hank" Greenberg ("Hank Greenberg") was, for the majority of the Class Period, the Chief Executive Officer ("CEO") and Chairman of the Board of the Company.  Defendant Hank Greenberg is a fiduciary of the Plan in that he exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

37.     Defendant Donald P. Kanak ("Kanak") is a member of the Company's Board of Directors and its Vice Chairman and Co-Chief Operating Officer.  Defendant Kanak is a fiduciary of the Plan in that he exercises discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

38.     Defendant Howard I. Smith ("Smith") is a member of the Company's Board of Directors and its Vice Chairman, Chief Administrative Officer and Chief Financial Officer. Defendant Smith has served on the Company's Board since 1997.  Defendant Smith is a fiduciary of the Plan in that he exercises discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

39.     Defendant Martin J. Sullivan ("Sullivan") is also a member of the Company's

Board of Directors and its Vice Chairman and Co-Chief Operating Officer.  Defendant Sullivan has been a member of the Company's Board since 2002.  Defendant Sullivan is a fiduciary of the Plan in that he exercises discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

40.     Defendant Edmund S.W. Tse ("Tse") has been a member of the Company's Board of Directors since 1996.  In addition, Defendant Tse is also the Senior Vice Chairman – Life Insurance for the Company.  Defendant Tse – as a member of the Board of Directors – is a fiduciary of the Plan in that he exercises discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

**Compensation Committee Defendants**

41.     According to the Company's most recent proxy filing, the "Compensation Committee" (f/k/a the "Stock Option and Compensation Committee"), a sub-committee of AIG's Board of Directors, "oversees the administration of AIG's compensation programs" and recommends to the board at large with regard to "compensation programs applicable to senior executives and other employee compensation."  Upon information and belief, the Compensation Committee was a fiduciary of the Plan in that it exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

42.     Defendant Marshall A. Cohen ("Cohen") served as a member of the Company's Board of Directors for at least a portion of the Class Period.  In addition, Defendant Cohen also served as a member of the Compensation Committee during a portion of the Class Period.  Defendant Cohen was a fiduciary of the Plan in that he exercised discretionary authority with

respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

43.     Defendant Frank J. Hoenemeyer ("Hoenemeyer") served as a member of the Company's Board of Directors for at least a portion of the Class Period.  In addition, Defendant Hoenemeyer also served as a member of the Compensation Committee during a portion of the Class Period.  In late April 2005, it was disclosed that Defendant Hoenemeyer would retire from the Board after the Company's annual shareholder meeting.   Defendant Hoenemeyer was a fiduciary of the Plan in that he exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

44.     Defendant Richard C. Holbrooke ("Holbrooke") served as a member of the Company's Board of Directors for at least a portion of the Class Period.  In addition, Defendant Holbrooke also served as a member of the Compensation Committee during a portion of the Class Period.  Defendant Holbrooke was a fiduciary of the Plan in that he exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

45.     Defendant Barber B. Conable, Jr. ("Conable") served as a member of the Company's Board of Directors for at least a portion of the Class Period.  In addition, Defendant Conable also served as a member of the Compensation Committee during a portion of the Class Period.   Defendant Conable was a fiduciary of the Plan in that he exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

46.     Defendant Ellen V. Futter ("Futter") served as a member of the Company's Board of Directors for at least a portion of the Class Period.  In addition, Defendant Futter also served as a member of the Compensation Committee during a portion of the Class Period.  Defendant Futter was a fiduciary of the Plan in that she exercised discretionary authority with respect to management and administration of the Plan and/or authority over the management and disposition of the Plan's assets.

47.     Defendants Hank Greenberg, Kanak, Smith, Sullivan, Tse, Cohen, Hoenemeyer, Holbrooke, Conable and Futter are hereafter collectively referred to as the "Director Defendants."  Defendants Cohen, Hoenemeyer, Holbrooke, Conable, and Futter are hereafter collectively referred to as the "Compensation Committee Defendants."

**Individual Defendants**

48.     Richard A. Grosiak ("Grosiak") was the director of employee benefits for the Company.  In addition, Defendant Grosiak was the Director of the AIG Retirement Board for at least part of the Class Period.  In this capacity, he signed the American General Corporation Agents' and Managers' Thrift Plan 2003 Form 11-K and the 2002 American General Employees' Thrift and Incentive Plan 2002 Form 11-K annual report to the SEC as "Director-Employee Benefits."  In addition, Grosiak signed AIG's 2002 Form 5500 as Plan Administrator. Defendant Grosiak was a fiduciary of the Plans in that he exercised discretionary authority with respect to management and administration of the Plans and/or management and disposition of the Plan's assets.

49.     John A. Amato ("Amato") was the Supervisor of Retirement Plans for AIG during at least part of the Class Period.  Upon information and belief, Defendant was a fiduciary of the Plan during the Class Period, since he exercised discretionary authority with respect to

management and administration of the Plan and/or management and disposition of the Plan's assets.

50.    Unknown Fiduciary Defendants 1-100 are residents of the United States and are or were fiduciaries of the Plans during the Class Period.  These Defendants, whose identities are currently unknown to Plaintiff, may include additional AIG and AGC employees.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## DEFENDANTS' FIDUCIARY STATUS

51.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

52.    During the Class Period, the Defendants acted as fiduciaries of the Plan(s) pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

53.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  Upon information and belief, AIG is a named fiduciary of the Plan and AGC is a named fiduciary of the AGC Plan.

54.    Instead of delegating all fiduciary responsibility for the Plans to external service providers, AIG and AGC chose to internalize at least some of these fiduciary functions.  These fiduciary delegates/appointees included, among others, at least the Compensation Committee and Individual Defendants.

**Additional Fiduciary Responsibilities**

55.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., performed fiduciary

functions.  Section 3(21)(A)(I) of ERISA, 29 U.S.C. §1002(21)(A)(I), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

56.   During the Class Period, Defendants' direct and indirect communications with the Plans' participants included statements about the Company and its stock, which caused Plaintiff and members of the Class to purchase, and to hold and maintain, investments in AIG stock, and to accept at face value investments in AIG's stock.  These communications included, but were not limited to, Company SEC filings, annual reports, and press releases.  The Company, and the individuals acting on the Company's behalf who provided this information to the Plans' participants, encouraged participants to review the information in these communications when evaluating the merits of investment in AIG's stock and also acted as fiduciaries to the extent of this activity.

## CLASS ACTION ALLEGATIONS

57.   Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between January 1, 1999 and the present (the "Class Period").

58.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a

minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

>    (a)     whether Defendants each owed a fiduciary duty to the Plans, Plaintiff and members of the Class;
>
>    (b)     whether Defendants breached their fiduciary duties to the Plans, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;
>
>    (c)     whether Defendants violated ERISA; and
>
>    (d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

61.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

62.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter,

be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

63.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

### DEFENDANTS' CONDUCT

**A.     Background**

64.     AIG is one of the world's leading international insurance and financial services organization, with operations in more than 130 countries and jurisdictions.   AIG member companies serve commercial, institutional and individual customers through extensive worldwide property-casualty and life insurance networks.   In the United States, AIG companies are the largest underwriters of commercial and industrial insurance and AIG American General is a top-ranked life insurer.   AIG's global businesses also include retirement services, financial services and asset management.   AIG's financial services businesses include:  aircraft leasing, financial products, trading, and market making.

65.     From 1967 to March 14, 2005, Defendant Maurice "Hank" Greenberg served as the CEO and Chairman of AIG.   The 79-year-old Greenberg had been CEO of AIG for 37 years and was only the second CEO in the company's history.

66.     Greenberg, however, wasn't satisfied with running the largest American insurance company; he also wanted to create a dynasty.  He groomed two of his sons, Jeffrey and Evan, for careers in the insurance industry, hiring them to work at AIG.  Although both Jeffrey and Evan parted ways with AIG with some rancor, they followed in their father's footsteps and both assumed leading roles at top corporate insurance companies, each of which had a complicated relationship with AIG.

67.     In 1999, Jeffrey was named CEO of the world's largest insurance broker, Marsh & McClennan Companies, Inc. ("MMC"), which had a virtual stranglehold on AIG because it represented the bulk of AIG's corporate clients.  Four years later, Evan, who possesses little formal education, was appointed CEO of ACE Ltd., a Bermuda-based insurer, which also has ties to AIG.  As a consequence, Hank Greenberg and his sons now sat atop three insurance companies with combined annual revenues of $103 billion.  According to Fortune magazine, in the insurance world the "Greenbergs were the closest thing to a royal family."

68.     This "royal family" was controlled by Defendant Greenberg, who not only ran his family, but also completely controlled AIG.  Indicative of the extent of Defendant Greenberg's control, Defendant Hoenemeyer stated in a sworn deposition in 2004 that he couldn't recall a time in the previous five years when AIG's board voted against a proposal made by Defendant Greenberg.

69.     Moreover, an April 3, 2005 *New York Times* article entitled "AIG: Whiter Shade of Enron," describes Defendant Greenberg as a "micromanager."  The article goes on to note the "disturbing similarities" between Enron and the situation at AIG, including a "management team willing to try any number of accounting tricks to make the company's results appear better than they actually were."  Subsequently, the *New York Times* described Defendant Greenberg in a

May 3, 2005 article as "the man behind the curtain, working furiously with a handful of colleagues at the top to maintain an awesome image to the investing world that was not quite reality." The full extent of the accounting tricks used to create the "mirage" that was AIG are just now coming to light and are described herein.

**B.     Bid Rigging**

70.     In 2004, the insurance industry and its "royal family" were rocked by an astonishing scandal. On October 14, 2004, New York Attorney General Eliot Spitzer ("Spitzer") filed a complaint[3] in the Supreme Court of New York against MMC and Marsh, Inc. ("Marsh"), alleging that Marsh, the largest insurance broker in the world, violated various statutory and common laws in concert with insurance companies, including AIG and Ace Ltd., Evan Greenberg's company. The Spitzer Complaint, which was based on Spitzer's investigation and review of subpoenaed documents, outlines in detail how Marsh, beginning in the late 1990s, and in violation of the law and in concert with several insurance companies including AIG and Ace Ltd., defrauded clients and consumers out of hundreds of millions of dollars.

71.     According to the allegations, the insurance market is comprised of three components: (i) clients – companies or individuals seeking insurance coverage; (ii) brokers - intermediaries hired by clients to recommend coverage and to obtain quotes from insurance companies; and (iii) insurance companies, such as AIG. The clients pay the brokers to evaluate all insurance provider options and recommend to them the best insurance option for their entity. In recommending products to clients, the brokers have a duty to procure the best deal possible. As a consequence, in addition to the premiums and costs of the insurance coverage, clients pay brokers an agreed-upon commission for their services.

---

[3] *The People of the State of New York by Eliot Spitzer v. Marsh & McLennan Cos., Inc.* (N.Y. Oct. 14, 2004) (referred to herein as the "Spitzer Complaint") is expressly incorporated herein by reference.

72.     Unbeknownst to many clients, in addition to the commissions paid by clients, brokers also received remuneration from the insurance companies.  These payments, sometimes termed "contingent commissions," were rewards to brokers for steering business to a particular insurance company.  In many instances, the insurance companies, such as AIG and Ace Ltd, pass the increased cost of doing business on to the consumers.  By passing through these costs and not completely and accurately disclosing these contingent commissions, "[e]ffectively, Marsh is secretly raising the price of insurance for its clients and putting at least some of the increase in its own pocket."  Spitzer Complaint, para. 42.

73.     AIG featured prominently as a player in Spitzer's allegations against Marsh.  It was listed as one of several large insurance companies that participated in a bid-rigging scheme with Marsh.  The factual allegations against AIG were as follows:

> Beginning in or around 2001 until at least the summer of 2004, Marsh Global Broking's Excess Casualty Group and AIG's American Home Excess Casualty Division (AIG's principal provider of commercial umbrella or excess liability and excess worker's compensations insurance) engaged in systematic bid manipulation.
>
> When AIG was the incumbent carrier and a policy was up for renewal, Marsh solicited what was called an "A Quote" from AIG, whereby Marsh provided AIG with a target premium and the policy terms for the quote.  If AIG agreed to quote the target provided by Marsh, AIG kept the business, regardless of whether it could have quoted more favorable terms or premium.
>
> In situations where another carrier was the incumbent, Marsh asked AIG for what was referred to as a "backup quote," "protective quote" or "B Quote," telling AIG that it would not get the business.  In many instances, Marsh provided AIG with a target premium and the policy terms for these quotes.  In these cases, it was understood that the target premium set by Marsh was higher than the quote provided by the incumbent, and that AIG should not bid below the Marsh-supplied target.  For example, in October 2003, an underwriter at AIG described a particular quote that he had provided thusly: "This was not a real opportunity.  Incumbent

Zurich [North America] did what they needed to do at renewal. We were just there in case they defaulted. Broker . . . said Zurich came in around $750K & wanted us to quote around $900K." [Undated AIG email]   Even when AIG could have quoted a premium lower than the target, it rarely did so.   Instead, AIG provided a quote consistent with the target premium set by March, thereby throwing the bid.

In other instances, Marsh asked AIG to provide B Quotes where AIG was not supposed to get the business, but Marsh did not set a particular premium target.   In these instances, AIG looked at the expiring policy terms and premium and provided a quote high enough to ensure that (1) the quote would not be a winner, and (2) in the rare case where AIG did get the business, it would make a comfortable profit.

In B Quote situations, AIG did not do a complete underwriting analysis.   In those few situations when AIG inadvertently won B Quote business (because the incumbent was not able or willing to meet Marsh's target), AIG personnel would "back fill" the underwriting work on the file – that is, prepare the necessary analysis after the fact.

Finally, Marsh came to AIG for a "C Quote" when there was no incumbent carrier to protect.   Although Marsh often provided premium targets in these situations, it was understood that there was the possibility of real competition.

The "A,B,C" quote system was strictly enforced by Marsh through William Gilman, Executive Director of Marketing at Marsh Global Broking and a Managing Director.   Gilman refused to allow AIG to put in competitive quotes in B Quote situations, and, on more than one occasion, warned that AIG would lose its entire book of business with Marsh if it did not provide B Quotes.   Gilman likewise advised AIG of the benefits of the system.   As he put it: Marsh "protected AIG's ass" when it was the incumbent carrier, and it expected AIG to help Marsh "protect" other incumbents by providing B Quotes.

*See* Spitzer Complaint, ¶¶ 44-50

74.     Rather than alerting the authorities to Marsh's scheme, AIG agreed to engage in this illegal conduct and benefited therefrom.  On October 14, 2004, two AIG executives pleaded guilty to felony charges of scheming to defraud for participating in the bid-rigging scheme

described in the Spitzer Complaint, with several others admitting guilt in the coming months.  As a result of the scandal, Marsh laid off 3,000 employees, and Jeffrey Greenberg, Hank Greenberg's eldest son, stepped down as CEO.  Marsh apologized for its "shameful" acts and agreed to pay $850 million in restitution to its victimized clients.

75.     Succinctly summarizing the relationship between the insurance companies and their bid-rigging scheme, Attorney General Spitzer stated that it was "the same kind of cartel-like behavior carried out by organized crime."

76.     In response to Attorney General Spitzer's announcement, which implicated AIG in the illegal contingent commission and bid-rigging schemes, AIG stock lost over 10% of its value.  It accounted for one-half of the decline in the Dow Jones Industrial Average for the day.  The following day, October 15, 2004, AIG stock fell an additional 3.6 percent – closing at $57.85 and representing a $24 billion loss in market capitalization for the Company.

77.     Attempting to calm the market's reaction to this shocking news, Defendant Greenberg asserted "[w]e are sickened by this action that took place and [are] doing everything to root this out promptly.  **As CEO of AIG, I take responsibility for everything that goes on within the company**."  (Emphasis added).

78.     Despite Defendant Greenberg's attempt to use his positive image to deflect the mounting negative press surrounding his Company, what was clear was that the Company had failed to properly follow the guidance set forth in the Department of Insurance's letter of August 25, 1998.  In this official policy statement, a "Circular Letter," the Department of Insurance **notified all brokers and insurers that they were obligated to fully disclose to customers all commissions and fee agreements**.

**C.    AIG's Accounting Improprieties**

79.    AIG's woes, however, were in no way limited to the fall-out from Marsh and Jeffrey Greenberg's fall from grace.  Indeed, from September 2004 through present, there have been almost weekly announcements regarding additional revelations surrounding the Company.  These revelations focus on the Company's illegal accounting techniques and its rampant use of accounting gimmickry.

80.    In addition to the rampant use of improper business techniques described above, the Company also engaged in numerous small-scale transactions which helped improve otherwise acceptable financial reports.  In a *Wall Street Journal* article dated May 2, 2005, people familiar with the Company's accounting machinations likened the Company's use of small-scale financial maneuvers to "gilding the lily."

**1.    Pre-Class Period Improprieties**

81.    In an April 27, 2005 *Wall Street Journal* article, it was disclosed that Defendant Greenberg had received a memorandum from the Company's top lawyer that questioned the Company's reporting of some premiums as revenue, thereby mitigating the Company's liability to the state.  State officials have the power to levy fees on sellers of workers' compensation coverage based on the premiums collected.  The fees are used to subsidize a fund used to pay benefits due from insolvent insurers.

82.    The *Wall Street Journal* article asserted that revenue improperly booked as deriving from general-liability policies, rather than worker compensation premiums, could lower a company's obligations to the fund.  Importantly, the article states that one person familiar with the issue claimed that AIG was doing this since the 1970s.  The article went on to state that the 1992 memo claimed that the Company's reporting of workers' compensation premiums was

"permeated with illegality" which was "so serious it could threaten the existence of senior management if disclosed." AIG's outside counsel, Sullivan & Cromwell, largely concurred with the legal conclusions in the memo and asserted that the Company should "stop these practices."

83.     A spokesperson for AIG was quoted in the article as saying that the "practice [was] largely . . . corrected by 1997." Interestingly, the *Journal* article questioned why AIG would even engage in such accounting improprieties since "from about 1990 until mid-2001, the Workers Compensation Security Fund was flush enough that New York law barred the state from collecting the assessment from publicly traded insurers." Nevertheless, New York state regulators plan to hire an independent auditor to review the Company's financial records to determine if the Company improperly booked insurance premium revenue.

## 2.     "Income Statement Smoothing"

84.     In 1997, AIG developed and marketed a "non-traditional" insurance product with its stated purpose of "income statement smoothing." In short, these insurance products would enable a public company to spread the recognition of known and qualified losses over several future reporting periods. The scheme worked by having a company appear to pay insurance premiums to AIG, with AIG assuming some insurance risk, when in fact the insurance premiums were nothing more than deposits with AIG which it subsequently paid back at a later date.

85.     On September 11, 2003 the SEC announced that it filed a civil accounting fraud action against AIG, Brightpoint, Inc. ("Brightpoint") and certain individuals, including an AIG employee, regarding the commission of securities fraud through the use of income statement smoothing. In particular, the action involved a deal between Brightpoint and AIG begun in December 1998 and consummated in January 1999 whereby AIG assisted Brightpoint in concealing $11.9 million in losses that Brightpoint sustained in 1998.

86.     In particular, AIG offered Brightpoint "retroactive coverage" (and some ostensible future coverage so as to avoid detection by the companies' respective auditors) for $15 million in premiums.  Brightpoint was then able to record an insurance receivable of $11.9 million against certain losses, thereby bringing its losses into its previously disclosed forecasted range.  Because AIG was required to pay the money back, the "retroactive insurance" should not have been accounted for as insurance since it was merely a "round-trip" of cash payments: insurance premiums for purported future "insurance claim payments."   This transaction permitted Brightpoint to overstate its earnings by an astonishing 61 percent.

87.     According to the order instituting the SEC action, a founding member of the AIG unit responsible for selling the "non-traditional" insurance discussed above wrote a paper distributed to thirty-two individuals, including management level AIG employees.  It became known as the "White Paper."  The "White Paper" asserted that one of the principal "attributes" of non-traditional insurance was "[i]ncome statement smoothing."  The "White Paper" went on to acknowledge that the accounting rules were specifically designed to avoid "income smoothing."  Shockingly, the White Paper suggested not including the insurance terms which would reveal the true nature of the "insurance" and instead rely on oral side agreements.

88.     The same day the civil accounting fraud action was filed, AIG agreed to settle the matter with the SEC.  AIG paid a $10 million fine and agreed to retain an independent consultant to "make binding recommendations concerning AIG's internal controls to ensure that AIG's insurance products" are not used to violate the securities laws in the future.  Perhaps a harbinger of things to come, the SEC's Associate Regional Director of the Commission's Northeast Regional Office, Mark K. Schonfeld, asserted that the $10 million penalty against AIG "reflect[ed] the gravity of its misconduct" in that "AIG did not come clean" due to its

withholding of documents, failure to review documents of key individuals for relevance and other abuses.[4]

### 3.    Additional Governmental Investigations

89.    On September 30, 2004, the Justice Department announced that it was probing AIG's possible violations of the securities laws relating to allegations of assisting PNC Financial Services Group, Inc. in shifting bad loans off of its books.  The SEC had previously announced a similar civil investigation with regard to the PNC transactions.  On October 4, 2004, the SEC announced that it was stepping into the fray and that it was considering filing a civil action against AIG for providing "false and misleading" statements in its press releases during the original investigation of PNC, which PNC settled two years prior in July 2002.

90.    AIG announced on October 21, 2004 that it was the target of a yet another investigation, this one a federal grand jury investigation in the Southern District of Indiana. According to the U.S. Attorney for the Southern District of Indiana, the investigation concerned "'non-traditional insurance' or 'income smoothing' products marketed by AIG that were directed at creating agreements with businesses that would appear to be insurance and accounted for as insurance, but did not involve any actual risk transfer."  More specifically, the investigation focused on a contract between AIG and Brightpoint, Inc.

91.    The criminal investigation was, upon information and belief, based on the same conduct that was the subject of an Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 21C of the Securities and Exchange Act of 1934 as to American International Group, Inc. (the

---

[4] Indicating the apparent corporate culture to obfuscate investigations into the Company, the *Wall Street Journal* reported on April 1, 2005 that an AIG employee had destroyed computer records and tape recordings of business meetings.  New York Attorney General Spitzer reportedly referred to these events as a "document caper" and warned that AIG had "serious criminal exposure" and would indict AIG if appropriate measures were not taken to stop such actions.

"SEC Cease-and-Desist Order") entered on September 11, 2003, for which AIG paid a $10 million fine.

92.     AIG acted quickly to quell the wave of negative publicity.  On November 30, 2004, AIG announced that it had reached a final settlement with the SEC, the Fraud Section of the United States Department of Justice ("DOJ"), and the United States Attorney for the Southern District of Indiana with respect to issues arising from certain structured transactions with Brightpoint, Inc., The PNC Financial Services Group, Inc. (PNC) and related matters. Pursuant to the proposed agreement, AIG would pay into an SEC disgorgement fund approximately $46 million in fees (and interest on the fees) on the PNC transactions.  Although the Brightpoint transaction previously settled with the SEC in 2003, the Company agreed to pay an additional penalty of $80 million to the DOJ.

### 4.     Defendants' Use of Private Holding Companies

93.     Describing another instance of the Defendants' potentially conflicted position, a March 22, 2005 *Wall Street Journal* article noted that independent directors were reconsidering the role of a private holding company, Starr International Co. ("Starr"), which was a payer of deferred compensation to AIG executives.  Created soon after AIG's 1969 initial public offering, Starr holds approximately 11.9% of AIG stock and is controlled by key AIG executives, including Mr. Greenberg.  Another related company, C.V. Starr, owns $2.5 billion of AIG stock and is chaired by Defendant Greenberg.

94.     Defendant Greenberg controls Starr.  Through his executive position with this company, Defendant Greenberg is able to control the executive compensation of key AIG employees.  Indeed, according to a *New York Times* article dated March 18, 2005, reported that

since 2001, Starr had set aside $270 million in pretax, long-term compensation for AIG employees.

95.    Further, according to a March 24, 2005 *Marketwatch.com* article, investigators were now scrutinizing donations made by The Starr Foundation to certain organizations that were either headed by or dear to certain AIG directors.  Interestingly, Defendant Greenberg is chairman and director of the Starr Foundation, while Defendant Smith is its treasurer.  One of the questionable donations is the Starr Foundation's contribution between 2001 and 2002 of $2.65 million to the National Bureau of Economic Research – the president of which is AIG's Board member, Martin S. Feldstein.  Andy Barile, an independent insurance and reinsurance consultant, was quoted as saying "[s]ophisticated arrangements like these are a lesson on how to control a public company's board without appearing to do so."

96.    The Board of Directors, according to recent press revelations, had first looked into changing the relationship between AIG, Starr and C.V. Starr in the fall of 2002.  These considerations were ultimately rejected at the time.  Indeed, Defendant Greenberg was quoted in a July 2003 memorandum as saying that "I knew that if I disturbed it I'd destroy something I built."  Nevertheless, the Company now faces a billion dollar lawsuit that alleges the companies engaged in self-dealing involving hundreds of millions of dollars between 1999 and 2002.

97.    This decision not to alter the relationship between AIG and Starr and C.V. Starr in 2002 appears to have been short-sighted.  According to an April 11, 2005 *Wall Street Journal* article, AIG did not book the deferred compensation from Starr as an expense, resulting in an announcement by AIG on March 30, 2005 that they were now planning changes to this policy. The article relates that if AIG had booked "Starr International's payments as an expense in 2003 [it] would have reduced AIG's previously reported net income of $9.27 billion by about 1%."

### 5.      Further Improprieties Engaged In By AIG

98.     By late winter 2005, it became apparent that AIG's troubles were far from over. On February 14, 2005, AIG announced that the Company "received subpoenas from the Office of the Attorney General for the State of New York and the Securities and Exchange Commission relating to investigations of non-traditional insurance products and certain assumed reinsurance transactions and AIG's accounting for such transactions."   Spitzer had broadened his investigation of the insurance industry to include the so-called nontraditional or loss mitigation products to determine whether they were really insurance aimed at reducing risk or were actually vehicles to help companies smooth earnings.  Having dismantled the schemes at Marsh, Spitzer poised himself to clean up AIG.

99.     On March 4, 2005, *The Wall Street Journal* published a story alleging that state investigators were looking into a deal between AIG and Berkshire Hathaway Inc.'s General Reinsurance ("General Re") unit in part because of the alleged involvement of AIG's Chairman and Chief Executive, Hank Greenberg.  The article stated that Hank Greenberg had "personally received at least one subpoena" over his role in the previously disclosed transaction with General Re.  In the following weeks, the Company would ultimately admit that the General Re transaction was not accounted for properly.  *See, e.g., CNNMoney.com*, May 2, 2005.

100.     Throughout the week of March 22, 2005, evidence suggesting that the Company had misled investors and regulators was mounting.[5]  The *Wall Street Journal* reported that, in addition to the questionable General Re transaction, investigators were focused on the

---

[5]  Also on March 22, 2005, AIG fired two top executives after the men signaled they would invoke their Fifth Amendment rights against possible self-incrimination as regulators investigated whether AIG manipulated its books to mislead investors.  The Company terminated Defendant Smith, who had been its Chief Financial Officer until he went on leave, and Christian M. Milton, a vice president who may have helped to execute the transaction with General Re.  It was disclosed on or about April 19, 2005 that Michael J. Castelli, an executive and former comptroller who was recently appointed chief administrative officer and senior vice president, was put on leave amid the accounting investigation.

Company's dealings with corporations located in lightly regulated offshore locales, such as Bermuda, Barbados and the Cayman Islands.

(a)   **General Re**

101.   In a March 30, 2005 announcement, the Company conceded that "in light of the lack of evidence of risk transfer," its accounting relating to the General Re reinsurance transactions "should not have been recorded as insurance."  As detailed in *Wall Street Journal* articles dated April 11 and April 13, 2005, AIG's accounting of the General Re deals "wrongly bolstered the amount of money AIG had set aside to pay claims – **a key figure for investors in evaluating the financial health of an insurance company**."  (Emphasis added.)  Furthermore, the April 13, 2005 article stated that certain AIG executives, including the newly terminated Christian Milton, were advised at the time of the deal by General Re executives that the transaction would not provide enough risk, to which AIG allegedly responded that they did not feel that the inadequate risk levels were an issue.

102.   The April 11, 2005 *Wall Street Journal* article also revealed the fact that "investigators also have learned that AIG didn't set up an underwriting file – essentially a risk analysis" for General Re deal.  This was not the first time that AIG failed to properly evaluate risk through its underwriting or internal policies.  As described in the Spitzer Complaint, underwriting was not properly performed on "B Quote" deals with Marsh, nor was there enough risk involved in the "non-traditional" or "income smoothing" transactions like the ones with Brightpoint that prompted the DOJ investigations.

103.   Perhaps most appalling, in addition to artificially increasing the Company's reserves, the AIG-General Re deals appear to have been done to meet or exceed Wall Street expectations.  For instance, the *New York Times* reported on March 15, 2005 that the Company's

first quarter 2001 results – which included the results of the General Re deal – were the first positive surprise on earnings by AIG in a year.  The same article also surmises that the deal was done to increase stock value at a time when the Company was trying to acquire American General.  Indeed, according to the article, to avoid paying American General shareholders a high premium, AIG stock needed to trade at a certain level during the acquisition.  Such self-dealing at the expense of the Plans and their participants clearly violates a fiduciary's obligation to avoid conflicts of interest.

### (b)  Offshore Dealings -- Union Excess and Richmond

104.    In concert with their scrutiny of the General Re deal, investigators were now looking into the Company's dealings with Union Excess Reinsurance Company, Ltd. ("Union Excess")[6] and Richmond Insurance Company Ltd. ("Richmond"), two offshore insurance companies with significant business with AIG.  *Bloomberg.com* reported on March 29, 2005 that 2003 state regulatory filings demonstrate that AIG used offshore reinsurance companies at least six times more than any of AIG's nine largest U.S. competitors.

105.    The Company's March 30, 2005 announcement also revealed that due to previously undisclosed evidence of AIG's control, Richmond should be treated as a consolidated entity and the Company was continuing to examine whether Union Express should be treated similarly as well.  In the Company's May 1, 2005 statement, it finally admitted that Union Express should also be treated as a consolidated entity.

106.    In short, by admitting that Richmond should have been treated as a consolidated entity, AIG tacitly admitted that its reinsurance deals with Richmond were illusory – the Company had purchased reinsurance from itself.  *Cbsmarketwatch.com* stated it succinctly on

---

[6]  According to an April 26, 2005 *New York Times Article*, the Company has admitted to New York insurance regulators that it had misled them regarding the relationship between AIG and Union Express.

March 30, 2005 when it plainly stated that liabilities purportedly removed from the Company were still effectively there.

**D.    The Truth is Revealed – AIG's Tangled Web Unweaves**

107.    In the post-Enron world, AIG's board was now under pressure to respond quickly and decisively to the regulatory inquiries.  On March 14, 2005, AIG announced that the Board of Directors of AIG had replaced Hank Greenberg as the Company's President and Chief Executive Officer, despite his thirty-seven year tenure.  At that time, AIG announced that Hank Greenberg would serve in the capacity of non-executive Chairman.  Also on March 14, 2005, AIG announced that it would delay filing its annual statement with the SEC until nearly month's end, about two weeks later than expected.

108.    With the storm clouds gathering around AIG, on March 28, 2004, Hank Greenberg retired from his position as Chairman of the Board, and announced that he would not stand for re-election to the Board at the AIG annual meeting.  On March 29, 2005, The *Wall Street Journal* published an article entitled "Buffett Is Called For Questioning In AIG Inquiry -- Chairman Greenberg Decides To Retire From Big Insurer; New Evidence of Problems."  The article, in relevant part, read:

> Late yesterday afternoon, one of Mr. Greenberg's lawyers, David Boies, submitted a letter on Mr. Greenberg's behalf, stating his intention to retire immediately to AIG's independent directors as they gathered for a meeting, this person said. Directors were prepared to debate options for dealing with Mr. Greenberg, including whether they could force him out as chairman, said people with knowledge of the board's deliberations. Mr. Greenberg's letter pre-empted that, this person said. One person going into the meeting remarked that he appreciated Mr. Greenberg "making it easy" for them.

***

31

Tensions had been high in recent days. On Friday, an increasingly frustrated Mr. Greenberg was miffed when he wasn't informed of a meeting by the independent directors, a person familiar with the matter said.

Last week, Mr. Greenberg's personal lawyers refused to immediately allow investigators to remove documents from Starr International Co. and C.V. Starr, private entities essentially controlled by Mr. Greenberg that are affiliated with AIG, this person said. The development worried AIG's independent directors, who were concerned that the action harmed AIG and would cause them and the company liability, another person familiar with the matter said.

Even though the independent directors pushed to sever all ties with Mr. Greenberg, they can't oust him from his leadership positions at the closely held Starr companies and related foundation, which own about 16% of AIG's common stock. But it is likely that the Starr companies will cease doing business with AIG in the future, a person familiar with the matter said.

Separately, AIG lawyers told regulators that the company engaged in about 50 transactions with one Barbados company that appeared to have improperly shifted liability to the offshore entity, said people familiar with the matter. The offshore company involved in the transactions was Union Excess Reinsurance Co., a Barbados company that appears to have AIG as its only U.S. customer. Lawyers also told regulators that the company has uncovered evidence indicating that AIG controlled both Union Excess and another offshore company, Richmond Insurance Co., the people said.

109.   On March 30, 2005, AIG announced that the filing of its 2004 Form 10-K annual report with the SEC would be delayed beyond the already extended March 31, 2005 due date in order to provide AIG, its Board of Directors, and its new management adequate time to complete their extensive review of AIG's books.  In the Company's press release, in addition to detailing many accounting errors, AIG admitted that "**[c]ertain but not all of the original characterizations resulted from transactions which appear to have been structured for the sole or primary purpose of accomplishing a desired accounting result.**"  (Emphasis added.)

Moreover, AIG admitted that the maximum aggregate effect on AIG's restatement would be a decrease of approximately two percent from the previously reported unaudited consolidated shareholders' equity of $82.87 billion, or 1.7 billion.

110.    On April 3, 2005, in a letter to its shareholders, AIG revealed that

> Recently, AIG became aware of efforts to remove documents and information relating to Starr from its Bermuda building without AIG's permission.  AIG immediately brought these incidents to the attention of the relevant authorities.  AIG has been cooperating with the New York Attorney General and the Securities and Exchange Commission with regard to document security in New York, Bermuda, Ireland, and other locations.   As previously disclosed, one individual in Bermuda was terminated for failure to cooperate with AIG's review, and several other AIG employees in Bermuda have resigned.

Among those resigning were attorneys representing Hank Greenberg.

111.    On April 12, 2005, as has been widely reported, Hank Greenberg invoked the Fifth Amendment to the Constitution in his deposition with investigators from several government entities, including the SEC and Spitzer's office, and declined to answer questions that might be self-incriminating.

112.    On April 29, 2005 the Company revealed that it would again delay its already twice-delayed annual filing due to further revelations regarding additional accounting problems. Indeed, in a 150 page internal report prepared by the law firms of Simpson Thacher & Bartlett and Paul, Weiss, Rifkind, Wharton & Garrision, it was asserted that the Company's top management ran the Company without any oversight or regulation and that there was significant weakness in the Company's financial controls.  The *Wall Street Journal* reported on May 2, 2005 that people who have seen drafts of the report said that it was "unflattering" in its portrayal of Defendants Greenberg and Smith.

113.    On May 1, 2005, the Company announced even more accounting improprieties, in addition to the ones outlined above.    In short, the Company now faced serious questions regarding the propriety of its business dealings, including:

a)    Internal Control Weakness[7] including "(i) the ability of certain former members of senior management to circumvent internal controls over financial reporting in certain circumstances, (ii) ineffective controls over accounting for certain structured transactions and transactions involving complex accounting standards and (iii) ineffective balance sheet reconciliation processes;"

b)    Insufficient Risk Transfer: because of a lack of transfer of risk, certain insurance or reinsurance agreements would now be recorded as premiums with appropriate loss reserves accounted for;

c)    Inaccurate Assets Values Realization AIG:  specifically the Company would now increase the amount of reserves they maintained for certain agreements;

d)    Other Than Temporary Declines:  AIG disclosed that improperly recorded impairment of assets in the wrong quarter and would have to adjust its books accordingly;

e)    Net Investment Income: from the period 2001 through 2003, in violation of accepted accounting principles, the Company improperly recognized income as net investment income rather than capital gains;

f)    Synthetic Fuel Investment: AIG improperly recognized tax credits generated from synthetic fuel investments as net investment income rather than recognize them as a reduction of income tax expense;

g)    Hedge Fund Accounting: AIG quickly shifted money in and out of hedge funds near the end of fiscal quarters to burnish AIG's results;

h)    Expense Deferrals, Dip In Reserves: the Company's investigation has revealed instances of deferrals increasing and/or reserves decreased so as to increase reported earnings;

i)    Life Settlements: AIG admitted that certain aspects of its accounting for Life Settlements (monetizing the value of existing life insurance policies) were "incorrect;"

j)    Derivatives: in addition to the foregoing, according to the Company's May 1, 2005 announcement, there appear to be instances where the Company

---

[7]    Due to this material weakness in accounting controls, it was reported that PricewaterhouseCoopers would issue an adverse opinion in its own report on the Company's financials.

improperly accounted for derivatives in violation of Financial Accounting Standards Board ("FASB") rule 133.

114.    In total, the Company announced in its May 1, 2005 statement that it now expected to restate earnings by approximately $2.7 billion, approximately 3.3 percent of the company's net worth.  Moreover, the Company also stated that **its financial results** for years 2000 through 2003 and the quarterly results for 2004 **should "no longer be relied upon"** due to its improper accounting.  (Emphasis added).  In short, since February 11, 2005 – the last day of trading before the Spitzer subpoena was disclosed – AIG stock has lost 26 percent of its value, representing approximately $50 billion in market capitalization, and shows no signs of recovery.

115.    Unfortunately for the Plans' participants, there is a significant chance that even more bad news could be looming in the future.  Indeed, although the financial restatement now represented approximately 3% of the Company's net worth, there is a substantial likelihood that the restatement could grow even larger.[8]  Indeed, Jay Gelb, an analyst for Lehman Brothers, predicted that the Company would ultimately take a charge between $5 - $8 billion, or up to 10% of the Company's net worth.

116.    Moreover, according to a May 3, 2005 *New York Times* article, it appears that nearly 90 percent of the $2.7 billion restatement – or $2.4 billion – consisted of items that would have been reflected on its income statement.  Consequently, that $2.4 billion would have affected both the profits and losses reported by the Company during the four-year period of the restatement.  Further, because the number was reported on an after-tax basis, the magnitude of the restatement will invariably increase when it is converted to a pre-tax basis, or approximately $3.4 billion.  Perhaps the most problematic area of the Company's restatement involves

---

[8] Illustrative of the Company's problems, both Moody's Investor Service and Fitch Ratings have downgraded the Company's long-term debt ratings.  Further, since January 1, 2005 alone, the Company's stock has been downgraded at least four times.

incorporating Union Express into the Company's financial statements. This incorporation alone represents a $1.2 billion reduction in AIG's revenues.

117.   Further, William M. Wilt, an insurance analyst at Morgan Stanley, was quoted in the same May 3, 2005 *New York Times* article as saying that he did "not think the stock will recapture the valuation levels it once enjoyed."  In addition, he also stated that "[t]here is clearly risk associated with an investment in shares of A.I.G." due to questions swirling around the Company as to whether A.I.G. will be able to sustain its growth without using accounting gimmickry.

118.   Despite the fact that Defendants knew of the illegal activities that affected/artificially inflated the value of AIG stock, and that Plaintiff and class members did not know about these activities, Defendants continued to promote Company stock to participants and beneficiaries of the Plans.

119.   Further, and in spite of the fact that Defendants knew of AIG's participation in the schemes that damaged the value of AIG stock, Defendants continued during the Class Period to allow AGC Plan participants to invest in the AIG stock fund, and until January 1, 2002, required all Company matching contributions to be held in the AIG stock fund until a participant reached age 60.  In the case of the AIG Incentive Savings Plan, plan documents and SEC/DOL filings reflect that Company Matching contributions were made in AIG stock during part of the Class Period, even though Defendants had intimate knowledge of the various improprieties and schemes at AIG (especially Defendants Greenberg & Smith, at the least).

**E.   Defendants Knew or Should Have Known that AIG was an Imprudent Investment for the Plans**

120.   At all relevant times, Defendants knew or should have known that AIG was engaged in the questionable business practices detailed above which made AIG Stock an

imprudent investment for the Plans.

121.    Indicative of the widespread knowledge of the rampant improprieties occurring at AIG, David Boies, attorney for Defendant Greenberg, recently stated that the decisions now being investigated "were made not merely by former senior management, but by present senior management, including operational heads, and the company's present directors and auditors as well."

122.    Moreover, it is simply inconceivable that Defendant Greenberg – who was personally implicated in the General Re transactions and the bid rigging – did not know the improper activities described above were occurring.  Indeed, a July 23, 2000 *New York Times* article describes Defendant Greenberg as "totally hands-on" and describes his monthly meetings with his divisional presidents as being akin to "a stern law professor putting students to a test" through his inquisition of each division's sales, expenses, profits and unusual developments.

123.    AIG, AGC, the Individual Defendants and the Committee Defendants failed to properly take into account the numerous practices that put AIG Stock at great risk, or the related fact that AIG stock was inflated in value, when determining the prudence of investing and holding the Plans' assets in AIG stock.

124.    As a result of Defendants' knowledge of and, at times, implication in, creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that AIG made to the Plans' participants regarding the Plans' investment in AIG stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

125.    In addition, the Company, AGC, and Individual Defendants, as the fiduciaries responsible for monitoring the Committee Defendants, failed to adequately review the

performance of the Committee Defendants to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.

126.   Defendants failed to conduct an appropriate investigation into whether AIG stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding AIG's improper activities so that participants could make informed decisions regarding AIG stock in the Plans.

127.   An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in AIG stock, under these circumstances, was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

128.   Because Defendants knew or should have known that AIG was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in AIG stock.

129.   Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of AIG stock; discontinuing further contributions to and/or investment in AIG stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that as a result of their employment by AIG they could not loyally serve the Plans' participants in connection with the Plans' acquisition and holding of AIG stock.

130.   Despite the availability of these and other options, Defendants failed to take any action to protect participants from losses as a result of the Plans' investment in AIG stock.  In

fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company Stock even as AIG's improper practices came to light.

**F.     Defendants Regularly Communicated with the Plan's Participants Regarding Investments in AIG Stock Yet Failed to Disclose the Imprudence of Investment in AIG Stock**

131.    Upon information and belief, the Company regularly communicated with employees, including participants in the Plans, about the performance, future financial and business prospects of the Company's common stock, one of the largest single assets in the Plans. During the Class Period, the Company fostered a positive attitude toward the Company's stock, and/or allowed Participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

132.    The SEC filings and related Company statements and releases issued during the Class Period were inaccurate, incomplete and materially misleading, causing the Plans' participants to purchase, and to hold and maintain, Plan investments in AIG stock.

133.    Indicative of the inaccurate, incomplete and materially misleading statements issued by Defendants during the Class Period, in the Company's third quarter filing with the SEC for 1999, the Company claimed that "**the commercial insurance market remains highly competitive** and excessively capitalized, both domestically and overseas."  (Emphasis added). The Company also asserted that:

> AIG enters into certain intercompany reinsurance transactions for its general and life operations. **AIG enters these transactions as a sound and prudent business practice in order to maintain underwriting control and spread insurance risk among various**

**legal entities.** These reinsurance agreements have been approved by the appropriate regulatory authorities. **All material intercompany transactions have been eliminated in consolidation.** (Emphasis added).

134.   In the Company's Annual Report filed with the SEC on April 1, 2002 for year ending December 31, 2001, the Company again asserted that "[t]he insurance industry is highly competitive" and that the Company exercises "good judgment in the selection and approval of both domestic and foreign companies participating in its reinsurance programs."

135.   These statements, their related press releases, and substantially similar SEC filings and press releases issued during the Class Period were inaccurate, incomplete and materially misleading in that they failed to properly inform the Plans' participants of the Company's use of bid rigging, relatedness to re-insurers (such as Union Express), and other improprieties described above.  These statements were made with the implicit knowledge that the Plans' participants would use such information in determining whether to maintain investment in AIG stock.

136.   The Company, Director Defendants, Compensation Committee and or the Plans' individual fiduciary delegates failed to provide the Plans' participants with complete and accurate information regarding AIG stock, such that the participants could appreciate the true risks presented by investments in AIG stock and could make informed decisions regarding investments in the Plans.

## CLAIMS FOR RELIEF UNDER ERISA

137.   At all relevant times, Defendants were and acted as fiduciaries of the Plan(s) within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

138.   ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

139.     ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty,"
provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches
any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be
personally liable to make good to such plan any losses to the plan resulting from each such
breach, and to restore to such plan any profits of such fiduciary which have been made through
use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial
relief as the court may deem appropriate, including removal of such fiduciary.

140.     ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in
pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely in the
interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to
participants and their beneficiaries, and with the care, skill, prudence, and diligence* under the
circumstances then prevailing that a prudent man acting in a like capacity and familiar with such
matters would use in the conduct of an enterprise of a like character and with like aims.

141.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the
*duties of loyalty, exclusive purpose and prudence* and are the "highest known to the law."  They
entail, among other things,

> a.      The duty to conduct an independent and thorough
> investigation into, and continually to monitor, the merits of
> all the investment alternatives of a plan;
>
> b.      A duty to avoid conflicts of interest and to resolve them
> promptly when they occur.  A fiduciary must always
> administer a plan with an "eye single" to the interests of the
> participants and beneficiaries, regardless of the interests of
> the fiduciaries themselves or the plan sponsor;
>
> c.      A duty to disclose and inform, which encompasses: (1) a
> negative duty not to misinform; (2) an affirmative duty to
> inform when the fiduciary knows or should know that
> silence might be harmful; and (3) a duty to convey

complete and accurate information material to the circumstances of participants and beneficiaries.

142.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co fiduciary," provides, in pertinent part, that:

> "…in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

Plaintiff therefore brings this action under the authority of ERISA §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

**Failure to Prudently and Loyally Manage the Plans' Assets
(Breaches of Fiduciary Duties in Violation of ERISA § 404 by All Defendants)**

143.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

144.    At all relevant times, as alleged above, all Defendants were fiduciaries of one or both of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

145.    As alleged above the Defendants were all responsible, in different ways and to differing extents, for the selection and monitoring of the Plans' investments, including those consisting of AIG securities.

146.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants or utilized by employers under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in AIG securities in the respective Plans were prudent and that such investment was consistent with the purpose of the Plans.  Defendants are liable for losses incurred as a result of such investments being imprudent.

147.    In addition, Defendants failed to conduct an appropriate investigation of the merits of continued investment in AIG securities by the Plans even in the face of obvious red flags that, at a minimum, raised serious questions regarding the risks of continued investment in AIG securities, including, among other information, reports of AIG's inappropriate business schemes.  Such an investigation would have revealed to a reasonably prudent fiduciary the clear imprudence of continuing to investment in AIG securities.

148.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries.  Also, a

fiduciary cannot allow others, including those whom they direct or who are directed by the plan, including plan trustees, to follow plan documents if to do so would also harm plan participants.

149.   The Defendants breached their duties to prudently and loyally manage the Plans' assets.   During the Class Period these Defendants knew or should have known that AIG securities were not suitable and appropriate investments for the Plans as described herein. Investment in AIG securities during the Class Period clearly did not assist in helping the Plans' participants save for retirement, and in fact caused significant losses/depreciation to such future "savings."   Despite all of this, these fiduciaries continued to offer the AIG securities as an investment vehicle for the Plans and to direct and approve the investment in AIG securities, instead of cash or other prudent investments.

150.   Similarly, at times during the Class Period, these fiduciaries permitted Company matching/employer contributions to be made in AIG securities. In so doing, Defendants further breached their fiduciary duties.   Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants failed to take appropriate steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investment in the AIG securities, including through the Company's matching/employer contributions in AIG securities.   Further, given that a significant concentration of the Plans' assets was invested in the securities of a single company – AIG – Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments.   All categories of Defendants failed to implement any such strategy.

151.   Moreover, the fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a

plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

152.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage an independent fiduciary who could make independent judgments concerning the Plan's investment in AIG securities; failing to notify the DOL of the facts and transactions which made AIG securities an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interest were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to AIG's inappropriate business practices and/or Defendants' own conflicted interests as Plan fiduciaries; and by otherwise placing the interests of AIG and themselves above the interests of the participants with respect to the Plans' investment in AIG securities.

153.    The Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plans' assets with respect to offering Company stock as an investment option in the Plan; providing and maintaining Company matching/employer contributions in AIG securities in the Plans, despite knowing that such action constituted a breach of fiduciary duties; enabling the Defendants' failure to prudently manage the Plans' assets, including the company match, as a result of their own fiduciary breaches; and, having knowledge of the failure to prudently manage the Plans' assets, yet not making any effort to remedy the breach.

154.    Specifically, at least some of the Defendants had actual knowledge of the Company's inappropriate business practices and/or constructive knowledge of this condition due

to their high-ranking positions at the Company.  Despite this knowledge, they participated in each others' failure to prudently manage the Plans' assets and knowingly concealed such failures by not informing participants that the Plans' significant holdings of AIG securities were not being prudently managed.  They also failed to remedy their mutual breaches of the duty to prudently manage the Plans' investment in AIG securities, despite unarguably having knowledge of such breaches.

155.    As a consequence of the Defendants' breaches of fiduciary duty, the Plans suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment savings.

156.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Monitor the Individual and Compensation Committee Defendants and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404
by AIG, AGC & Director Defendants)**

157.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

158.    At all relevant times, as alleged above, AIG, AGC and the Director Defendants were fiduciaries of the respective Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

159.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of AIG, AGC and the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.

160.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries (the Individual and Compensation Committee Defendants).  In this case, that means that the monitoring fiduciaries, AIG, AGC and the Director Defendants, had the duty to:

> (1)    Ensure that the Individual and Compensation Committee Defendants possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

> (2)    Ensure that the Individual and Compensation Committee Defendants are provided with adequate financial resources to do their job;

> (3)    Ensure that the Individual and Compensation Committee Defendants have adequate information to do their job of overseeing the Plans' investments;

> (4)    Ensure that the Individual and Compensation Committee Defendants have ready access to outside, impartial advisors when needed;

(5)    Ensure that the Individual and Compensation Committee Defendants maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

(6)    Ensure that the Individual and Compensation Committee Defendants report regularly to the Company and/or AGC.  The Company and/or AGC must then review, understand, and approve the conduct of the hands-on fiduciaries.

161.    Further, under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

162.    AIG, AGC and the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company securities and equity an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in undiversified investment funds which was made up primarily of Company securities, an investment that was imprudent.  AIG, AGC and the Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i)

imprudently allowing the Plans to continue offering AIG common stock as an investment alternative for the Plan, and (ii) continuing to invest the assets of the AIG Stock Fund in AIG securities when it no longer was prudent to do so.  Despite this knowledge, AIG, AGC and the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

163.   In addition, AIG, AGC and the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the Individual and Compensation Committee Defendants accurate information about the financial condition of AIG that they knew or should have known that these Defendants needed to make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plans and ERISA.

164.   AIG, AGC and the Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the Individual and Compensation Committee Defendants, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

165.   As a consequence of the Defendants' breaches of fiduciary duty, the Plans suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

166.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their

breaches of fiduciary duties alleged in this Count.

## COUNT III

**Failure to Provide Complete and Accurate Information
to Plan Participants and Beneficiaries
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and
405 of ERISA by All Defendants)**

167.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

168.    At all relevant times, as alleged above, Defendants were fiduciaries of the Plan(s) within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

169.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plans-related communications and material disclosures.

170.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information, regarding the Plans' investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.  This duty applies to all of the Plans' investment options, including investment in AIG stock.

171.    Because the Plans' AIG stock investments were not diversified (in addition to the fact that the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested, so significantly in AIG securities), such investment carried with it an inherently high

degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to AIG securities, including within the AIG Stock Fund.

172.   The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding AIG stock, the Company's inappropriate business practices, and the consequent artificial inflation of the value of AIG stock and, generally, by conveying inaccurate information regarding the soundness of AIG stock and the prudence of investing retirement contributions in AIG equity.  These failures were particularly devastating to the Plans and the participants; a significant percentage of the Plan's assets were invested in AIG securities during the Class Period and, thus, losses in this investment had an enormous impact on the value of participants' retirement assets.

173.   These actions and failures to act were uniform and caused the Plans, and/or the participants and beneficiaries of the Plans, to continue to make and maintain substantial investments in Company stock in the Plans at a time when these Defendants knew or should have known that the Plans' participants and beneficiaries (and non-defendant fiduciaries) did not have complete and accurate information concerning their investments.  Plaintiff and the Class relied to their detriment on these Defendants' incomplete and inaccurate statements regarding AIG stock.

174.   Defendants in this Count are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding AIG stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to

remedy the breaches.

175.   Specifically, Defendants named in this count knew or should have known that incomplete information had been provided by one another and the Plans' other fiduciaries, yet failed to undertake any action to remedy this breach.  In addition, the appointing fiduciaries named in this count, through their own failure to prudently monitor their appointees, enabled their co-fiduciaries named in this count to fail to provide complete and accurate information regarding AIG stock and the true risks that it presented as an investment for the Plans' participants' retirement investments.

176.   Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of the Plans that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in AIG Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested assets of the Plans in AIG stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

177.   As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered at least tens of millions of dollars in losses.  If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of

fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investment.

178.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## SECTION 404(c) DEFENSE INAPPLICABLE

179.    The Plans suffered a loss, and the Plaintiff and the other Class members suffered losses, because substantial assets in the Plans were invested in AIG securities during the Class Period in violation of the Defendants' fiduciary duties.

180.    As to contributions invested in AIG common stock, Defendants were responsible for the prudence of investments provided under the Plans during the Class Period, unless the Plans satisfied the procedural and substantive requires of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

181.    Section 404(c) provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions, but not for liability for the selection of imprudent investment options for the Plans.   In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions.   In addition, § 404(c) only applies if participants are informed that "the Plan is intended to constitute a plan described in § 404(c) and [the regulations], and that fiduciaries of the plan may be relieved of liability for any losses which are the direct and necessary result of investment instructions given by such participants or beneficiary."  29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(I).

182.    As alleged above, Defendants failed to provide participants with complete and accurate information regarding investment of their retirement savings in AIG stock under the

Plans.  Accordingly, participants failed to exercise the requisite independent control over their investment in AIG stock in the Plans.

183.    The Defendants' liability to Plaintiff for relief stemming from the Plans' imprudent investments in AIG stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period, without regard to whether or not the participants relied upon statements, acts, or omissions of Defendants.

## CAUSATION

184.    The Plans suffered at least tens of millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in AIG securities during the Class Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plans' participants.

185.    Defendants are responsible for losses caused by participant direction of investment in AIG common stock because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants failed to apprise Plaintiff of the Company's inappropriate business practices nor the invariable harm to the Company once these practices were revealed, thereby misrepresenting its soundness as an investment vehicle.   As a consequence, participants did not exercise independent control over their investments in AIG stock, and Defendants remain liable under ERISA for losses caused by such investment.

186.    Defendants are also responsible for all losses caused by the investment of the Plans' Company matching/employer contributions in AIG common stock during the Class

Period, as Defendants controlled the investment, and the investment was imprudent.

187.   Had the Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning the Company's illicit business practices and the corresponding prudence of investment in AIG common stock, the elimination of the AIG Stock Fund as investment alternatives when they became imprudent, and the divesture of the Plans from the AIG Stock Fund when maintaining such investments became imprudent, the Plans would have avoided a substantial portion of the losses that they suffered through their continued investment in the AIG securities.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

188.   The Defendant-fiduciaries breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been so heavily invested in AIG equity.

189.   As a consequence of the Defendants' breaches, the Plans suffered significant losses.

190.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

191.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or

maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the Plans had been properly administered.

192.   Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

193.   Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.   A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.   A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.   An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits

the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in AIG securities maintained by the Plans in proportion to the accounts' losses attributable to the decline in the price of AIG stock held by the Plans during the Class Period;

H.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.     An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     An Order for equitable restitution and other appropriate equitable monetary relief against the defendants.

Dated:  May 3, 2005                         **BRODSKY & SMITH, LLC**


                                            By: _/s/ Evan J. Smith, Esquire (ES 3254)___
                                            Evan J. Smith, Esquire (ES3254)
                                            240 Mineola Boulevard
                                            Mineola, NY 11501
                                            (516) 741-4977

**SCHIFFRIN & BARROWAY, LLP**
Joseph H. Meltzer, Esquire
Edward W. Ciolko, Esquire
Gerald D. Wells, III, Esquire
280 King of Prussia Road
Radnor, PA 19087
Telephone:  (610) 667-7706

**Counsel for Plaintiff**